# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Rukhsanah L. Singh |
| v. | Mag. No. 2025-mj-14030 (RLS) |
| EVANDER THEUS and JOHN SCIPIO | **CRIMINAL COMPLAINT** |

I, Robert A. Moraca, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco Firearms and Explosives, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

/s/ Robert A. Moraca
Robert A. Moraca
Special Agent Bureau of Alcohol,
Tobacco Firearms and Explosives

**RECEIVED**
AUG -6 2025
AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A)
on August 6, 2025,
in the District of New Jersey

Hon. Tonianne J. Bongiovanni
United States Magistrate Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## **ATTACHMENT A**

<u>COUNT ONE</u>
(Conspiracy to Traffic in Firearms)

From in or around March 2025 to in or around August 2025, in Middlesex County, in the District of New Jersey and elsewhere, the defendants,

EVANDER THEUS and
JOHN SCIPIO

did knowingly and intentionally conspire and agree with each other and others to ship, transport, transfer, cause to be transported, and otherwise dispose of firearms to another person in and otherwise affecting interstate and foreign commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of the firearm by the recipient would constitute any offense under Federal or State law punishable by imprisonment for a term exceeding one year, contrary to Title 18, United States Code, Section 933(a)(1).

In violation of Title 18, United States Code, Section 933(a)(3).

## ATTACHMENT B

I, Robert A. Moraca, am a Special Agent with the Alcohol, Tobacco Firearms and Explosives ("ATF"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents and other items of evidence. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### I. BACKGROUND

1. Since in or around March 2025, law enforcement has been investigating a firearms-trafficking network, which includes defendants EVANDER THEUS ("THEUS") and JOHN SCIPIO ("SCIPIO"), and which operates in and around Middlesex County, New Jersey and elsewhere.

2. A confidential source of information ("CS-1") assisted law enforcement during this investigation, including by conducting controlled purchases of firearms and ammunition from members of the conspiracy, including THEUS and SCIPIO. The information and assistance provided during the investigation by CS-1 has been corroborated through other evidence law enforcement has obtained, including consensually recorded telephone communications and in-person meetings with the defendants, physical surveillance, and other investigative techniques.

3. An undercover law enforcement officer ("UC-1") also made purchases of firearms and ammunition from members of the conspiracy, including THEUS and SCIPIO

4. Law enforcement's investigation has revealed the manner and means by which members of the conspiracy carried out the organization's unlawful firearms trafficking activities.

5. During the investigation, between in or around April 2025 and July 2025, law enforcement conducted numerous controlled purchases of firearms from THEUS AND SCIPIO, as summarized in the chart below.

| Date | Defendant(s) Involved in Selling Firearm(s) | Firearm(s) Purchased |
|---|---|---|
| 4/1/2025 | THEUS and SCIPIO | One Spikes Tactical multi-caliber Model AR-15 firearm with a defaced serial number. |
| 4/3/2025 | THEUS and SCIPIO | One Xtreme Gun Worx multi-caliber Model X-15 firearm with a defaced serial number. |
| 4/10/2025 | THEUS and SCIPIO | Two Anderson Mfg. multi-caliber Model AM-15 firearms, with defaced serial numbers. |
| 4/16/2025 | THEUS and SCIPIO | Four Xtreme Gun Worx multi-caliber Model X-15 firearms with defaced serial numbers |
| 5/1/2025 | THEUS and SCIPIO | Two Anderson Mfg. multi-caliber Model AM-15 firearms and three Xtreme Gun Worx multi-caliber Model X-15 firearms, all with defaced serial numbers. |
| 5/13/2025 | THEUS and SCIPIO | Two DPMS Panther Arms multi-caliber Model DA-15 firearms, one Spikes Tactical multi-caliber Model ST-15 firearm; one Xtreme Gun Worx multi-caliber Model X-15 firearm; one Aero Precision multi-caliber Model X-15 firearm, one Taurus Judge .45 caliber revolver, one Smith and Wesson M&P 9mm semi-automatic pistol all with defaced serial numbers. |
| 6/3/2025 | THEUS and SCIPIO | Two Anderson Mfg. multi-caliber Model AM-15 firearms with defaced serial numbers. |
| 6/12/2025 | THEUS and SCIPIO | Five DPMS Panther Arms multi-caliber Model DA-15 firearms, with defaced serial numbers |
| 7/10/2026 | THEUS and SCIPIO | One Kel-Tec .32 caliber pistol, one Taurus .38 caliber revolver, three Anderson Mfg. multi-caliber Model AM-15 firearms, one DPMS Panther Arms multi-caliber Model DA-15 firearm, and one Spikes Tactical Model multi-caliber Model ST-15 firearm, all with defaced serial numbers. |

6. At all times relevant to this complaint, neither THEUS nor SCIPIO is or ever was a federally licensed dealer, importer, or manufacturer of firearms. In fact, THEUS is a previously convicted felon and, therefore, prohibited from possessing a firearm under federal law.

## II. CONTROLLED PURCHASES OF FIREARMS

### The April 1, 2025 Purchase of a Defaced Firearm

7. On or about April 1, 2025, CS-1 placed a call to THEUS. In that recorded conversation, THEUS confirmed his agreement to sell an AR-15-style firearm to CS-1 for $1,500. THEUS further confirmed that the deal would take place at a location in Middlesex County, New Jersey (the "Meeting Location").

8. Prior to CS-1's meeting with THEUS, law enforcement officers searched CS-1 and their vehicle ("CS-1's Vehicle") for contraband, currency, and weapons, which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided CS-1 with a device with audio recording capabilities and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's Vehicle.

9. CS-1 arrived at the Meeting Location at approximately 5:00 p.m. Approximately 45 minutes later, law enforcement officers observed THEUS exiting a black Toyota RAV-4 (the "RAV-4"). THEUS walked from the RAV-4 to CS-1's Vehicle carrying a black bag and entered CS-1's Vehicle. While inside CS-1's Vehicle, THEUS sold CS-1 a Spikes Tactical multi-caliber Model AR-15 firearm with a defaced serial number for $1,500.

10. THEUS departed CS-1's Vehicle, returned to the RAV-4, and the RAV-4 drove away from the Meeting Location. Law enforcement surveilled the RAV-4 as it drove to a location in Allentown, Pennsylvania (the "Theus Residence"). Upon arrival, THEUS got out of the RAV-4 and entered the Theus Residence, and the RAV-4 drove away.

11. CS-1 departed the Meeting Location in CS-1's Vehicle. CS-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the recording device previously provided to CS-1 and processed it as evidence.

**The April 3, 2025 Purchase of a Defaced Firearm.**

12. On April 3, 2025, CS-1 spoke with THEUS. In that recorded conversation, THEUS confirmed his agreement to sell another AR-15-style firearm to CS-1 for $1,500. THEUS also confirmed that they would meet at the same Meeting Location.

13. Prior to CS-1's meeting with THEUS, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided CS-1 with a device with audio recording capabilities to record the meeting and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's Vehicle.

14. At approximately 6:00 p.m., law enforcement officers observed the RAV-4 approach the Theus Residence. Shortly thereafter, THEUS exited the Theus Residence carrying a white bag and entered the RAV-4. The RAV-4 then drove to the Meeting Location.

15. At approximately 7:00 p.m., law enforcement officers observed THEUS exit the RAV-4 carrying a white bag. THEUS then walked to CS-1's Vehicle and entered. While inside CS-1's Vehicle, THEUS sold CS-1 an Xtreme Gun Worx multi-caliber Model X-15 firearm with a defaced serial number for $1,500.

16. THEUS then left CS-1's Vehicle, entered the RAV-4, and the RAV-4 drove away from the Meeting Location. CS-1 then departed the Meeting Location in CS-1's Vehicle. CS-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the recording device previously provided to CS-1 and processed it as evidence.

**The April 10, 2025 Purchase of Two Defaced Firearms.**

17. On April 10, 2025, CS-1 spoke with THEUS. In that recorded conversation, THEUS confirmed his agreement to sell two AR-15-style firearms to CS-1 for $3,200. THEUS also confirmed the deal would take place at the same Meeting Location.

18. Prior to CS-1's meeting with THEUS, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting

6

Location. Law enforcement provided CS-1 with a device with audio and video recording capabilities to record the meeting and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's Vehicle.

19. At approximately 11:30 a.m., law enforcement observed John SCIPIO ("SCIPIO") enter the RAV-4, which was parked in front of his residence in Allentown, Pennsylvania (the "Scipio Residence"). SCIPIO drove the RAV-4 to the Theus Residence. Shortly after the RAV-4 arrived, THEUS exited the Theus Residence carrying a large box and entered the RAV-4. The RAV-4 then drove to a nearby convenience store, where both THEUS and SCIPIO went inside briefly before returning to the RAV-4. SCIPIO then drove the RAV-4 to the Meeting Location.

20. At approximately 1:00 p.m., THEUS exited the RAV-4, carrying a large box. THEUS then walked to CS-1's Vehicle and entered with the box. While inside CS-1's vehicle, THEUS sold CS-1 two Anderson Mfg. multi caliber Model AM-15 firearms, with defaced serial numbers as well as three high-capacity magazines for $3,200. THEUS then left CS-1's Vehicle, returned to the RAV-4, and the RAV-4 drove away from the Meeting Location.

21. CS-1 departed the Meeting Location in CS-1's Vehicle. CS-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the recording device previously provided to CS-1 and processed it as evidence.

### The April 16, 2025 Purchase of Four Defaced Firearms.

22. On April 16, 2025, CS-1 spoke with THEUS. In that recorded conversation, THEUS confirmed his agreement to sell four AR-15-style firearms to CS-1 for $5,200. THEUS also confirmed the deal would take place at the same Meeting Location.

23. Prior to CS-1's meeting with THEUS, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided CS-1 with a device with audio and video recording capabilities to record the meeting and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's Vehicle.

24. At approximately 9:00 a.m., law enforcement officers observed SCIPIO enter the RAV-4, which was parked in front of the Scipio Residence and

drive the RAV-4 to the THEUS Residence. Shortly after the RAV-4 arrived, THEUS and another man ("CC-1") exited the THEUS Residence. THEUS was carrying a large box. THEUS and CC-1 then entered the RAV-4, and the RAV-4 then drove to the Meeting Location.

25. At approximately 10:30 a.m., law enforcement officers observed THEUS as he exited the RAV-4, carrying a large box. THEUS then walked to CS-1's Vehicle and entered. While inside CS-1's Vehicle, THEUS sold CS-1 four Xtreme Gun Worx multi-caliber Model X-15 firearms with defaced serial numbers and eight high-capacity magazines for $5,200. THEUS then left CS-1's Vehicle, returned to the RAV-4, and the RAV-4 drove away from the Meeting Location.

26. CS-1 departed the Meeting Location in CS-1's Vehicle. CS-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the recording device previously provided to CS-1 and processed it as evidence.

### The May 1, 2025 Purchase of Five Defaced Firearms.

27. On May 1, 2025, CS-1 spoke with THEUS. In that recorded conversation, THEUS confirmed his agreement to sell five AR-15-style firearms to CS-1 for $6,500. THEUS also confirmed the deal would take place at the same Meeting Location.

28. Prior to CS-1's meeting with THEUS, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided CS-1 with a device with audio and video recording capabilities to record the meeting and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's Vehicle.

29. At approximately 7:00 p.m., law enforcement officers observed the RAV-4 arrive at the Meeting Location. THEUS exited the RAV-4, carrying a large box. THEUS then walked to CS-1's vehicle and entered. While inside CS-1's Vehicle, THEUS sold CS-1 two Anderson Mfg. multi-caliber Model AM-15 firearms and three Xtreme Gun Worx multi-caliber Model X-15 firearms, all with defaced serial numbers, as well as five high-capacity magazines. THEUS then left CS-1's Vehicle, returned to the RAV-4, and the RAV-4 drove away from the Meeting Location.

30. CS-1 departed the Meeting Location in CS-1's Vehicle. CS-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the recording device previously provided to CS-1 and processed it as evidence.

### The May 13, 2025 Purchase of Seven Defaced Firearms.

31. On May 13, 2025, CS-1 spoke with THEUS. In that conversation, THEUS confirmed his agreement to sell five AR-15-style firearms and two pistols to CS-1 for $8,600. THEUS also confirmed that the deal would take place at the same Meeting Location.

32. Prior to CS-1's meeting with THEUS, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided CS-1 with a device with audio and video recording capabilities to record the meeting and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's Vehicle.

33. At approximately 6:00 p.m., law enforcement officers observed SCIPIO arrive at the THEUS Residence, exit the RAV-4 and enter the Theus Residence. Shortly thereafter, THEUS and SCIPIO exited the Theus Residence. SCIPIO was carrying a box, which he placed in the RAV-4, and THEUS was carrying a bag, which he placed in the RAV-4. They then entered the RAV-4 and drove to the Meeting Location.

34. At approximately 7:00 p.m., law enforcement officers observed THEUS exiting the RAV-4, carrying a large box. THEUS then walked to CS-1's Vehicle and entered. While inside CS-1's Vehicle, THEUS sold CS-1 the following defaced firearms: two DPMS Panther Arms multi-caliber Model DA-15 firearms, one Spikes Tactical multi-caliber Model ST-15 firearm; one Xtreme Gun Worx multi-caliber Model X-15 firearm; one Aero Precision multi-caliber Model X-15 firearm, one Taurus Judge .45 caliber revolver, one Smith and Wesson M&P 9mm semi-automatic pistol and twelve high-capacity magazines, two collapsible rife stock and two Smith & Wesson pistol magazines. THEUS then left CS-1's Vehicle and got into the RAV-4, and the RAV-4 drove away from the Meeting Location.

35. CS-1 departed the Meeting Location in CS-1's Vehicle. CS-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law

9

enforcement officers recovered the recording device previously provided to CS-1 and processed it as evidence.

### The June 3, 2025 Purchase of Two Defaced Firearms.

36.     On June 3, 2025, CS-1 attempted to place a call to SCIPIO. However, THEUS answered. In that recorded conversation, THEUS confirmed his agreement to sell two AR-15-style firearms CS-1 for $2,700. THEUS also confirmed they would meet at the same Meeting Location. CS-1 confirmed that another person, UC-1 (who, unbeknownst to THEUS, was an undercover law enforcement officer) would also be attending the meeting.

37.     Prior to CS-1's meeting with THEUS, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons, which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided CS-1 with a device with audio and video recording capabilities to record the meeting and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's vehicle.

38.     UC-1 drove to the Meeting Location in an undercover police vehicle ("UC-1's Vehicle"). Prior to UC-1's meeting with THEUS, law enforcement officers searched UC-1's Vehicle for contraband, currency, and weapons, which yielded negative results. Law enforcement provided UC-1 with a device with audio recording capabilities to record the meeting and funds to complete the firearms purchase.

39.     At approximately 11:00 a.m., law enforcement officers observed the RAV-4 enter the parking lot of the Meeting Location. THEUS, SCIPIO and another individual ("CC-2") then exited the RAV-4. CS-1 and UC-1 then exited their vehicles. THEUS, SCIPIO, CC-2, CS-1 and UC-1 then spoke for several minutes in the parking lot. THEUS and CS-1 then walked to CS-1's vehicle and entered. SCIPIO then walked over to the RAV-4, removed a black bag, and entered CS-1's Vehicle. While inside CS-1's Vehicle, THEUS and SCIPIO sold UC-1 and CS-1 two Anderson Mfg. multi-caliber Model AM-15 firearms with defaced serial numbers as well as four high-capacity magazines. THEUS and SCIPIO then left CS-1's vehicle, THEUS, SCIPIO and CC-2 got into the RAV-4, and the RAV-4 drove away from the Meeting Location.

40.     CS-1 and UC-1 departed the Meeting Location in their respective vehicles. CS-1 and UC-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1, UC-1 and CS-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the

recording devices previously provided to UC-1 and CS-1 and processed them as evidence.

### The June 12, 2025 Purchase of Five Defaced Firearms.

41. On June 9, 2025, UC-1 engaged in multiple text conversations with THEUS and with SCIPIO. In those text messages, THEUS and SCIPIO agreed to sell five AR-15-style firearms to UC-1 for $6,750, and to meet at the same Meeting Location on June 12, 2025.

42. On June 12, 2025, UC-1 drove to the Meeting Location in UC-1's Vehicle. Prior to UC-1's meeting with THEUS, law enforcement officers searched UC-1 and UC-1's Vehicle for contraband, currency, and weapons, which yielded negative results. Law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided UC-1 with a device with audio recording capabilities to record the meeting and funds to complete the firearms purchase.

43. At approximately 7:00 p.m., law enforcement officers observed the RAV-4 enter the parking lot of the Meeting Location. THEUS and SCIPIO then exited the RAV-4. SCIPIO was carrying a large box. THEUS and SCIPIO then walked to UC-1's Vehicle and entered. While inside UC-1's Vehicle, THEUS and SCIPIO sold UC-1 five DPMS Panther Arms multi-caliber Model DA-15 firearms, with defaced serial numbers. THEUS and SCIPIO then left UC-1's Vehicle, got into the RAV-4, and the RAV-4 drove away from the Meeting Location.

44. UC-1 departed the Meeting Location in UC-1's Vehicle. UC-1 arrived at a pre-determined debriefing location. There, law enforcement officers searched UC-1 and UC-1's Vehicle for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the recording device previously provided to UC-1 and processed it as evidence.

### The July 10, 2025 Purchase of Seven Defaced Firearms.

45. On July 10, 2025, UC-1 called SCIPIO. In that conversation, SCIPIO agreed to sell five AR-15-style firearms to UC-1 for $6,760. UC-1 and SCIPIO agreed to meet at the same Meeting Location.

46. Later the same day, July 10, 2025, CS-1 called SCIPIO. In that conversation, SCIPIO agreed to sell two pistols to CS-1 for $2,100. CS-1 and SCIPIO also agreed to meet at the same Meeting Location.

47. Prior to CS-1's meeting with SCIPIO, law enforcement officers searched CS-1 and CS-1's Vehicle for contraband, currency, and weapons,

which yielded negative results. In addition, ahead of the meeting, law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided CS-1 with a device with audio and video recording capabilities to record the meeting and funds to complete the firearms purchase. CS-1 proceeded directly from the briefing location to the Meeting Location in CS-1's vehicle.

48. UC-1 drove to the Meeting Location in UC-1's Vehicle. Prior to UC-1's meeting with SCIPIO, law enforcement officers searched UC-1 and UC-1's Vehicle for contraband, currency, and weapons, which yielded negative results. Law enforcement officers established surveillance in the vicinity of the Meeting Location. Law enforcement provided UC-1 with a device with audio recording capabilities to record the meeting and funds to complete the firearms purchase.

49. At approximately 11:00 a.m., law enforcement observed the RAV-4 enter the parking lot of the Meeting Location. SCIPIO and CC-2 then exited the RAV-4. SCIPIO and CC-2 then walked to CS-1's Vehicle and entered. While inside CS-1's Vehicle, SCIPIO sold CS-1 one Kel-Tec .32 caliber pistol (the "Kel-Tec") and one Taurus .38 caliber revolver (the "Taurus"). CS-1 told SCIPIO that he was only going to pay $800 for the Kel-Tec because the Taurus was not worth $1,100. SCIPIO then called THEUS, and CS-1 and THEUS agreed that CS-1 would take both firearms, CS-1 would pay $800 to Scipio, but CS-1 would meet with THEUS the next day to complete the purchase of the Taurus. SCIPIO and CC-2 then left CS-1's Vehicle.

50. SCIPIO then returned to the RAV-4, removed a black bag and walked to UC-1's Vehicle and entered. While inside UC-1's Vehicle, SCIPIO sold UC-1 three Anderson Mfg. multi-caliber Model AM-15 firearms with defaced serial numbers, one DPMS Panther Arms multi-caliber Model DA-15 firearm with a defaced serial number and one Spikes Tactical Model multi-caliber Model ST-15 firearm with a defaced serial number, as well as five high-capacity magazines. SCIPIO then left UC-1's Vehicle, SCIPIO and CC-2 returned to the RAV-4, and the RAV-4 drove away from the Meeting Location.

51. UC-1 and CS-1 then departed the Meeting Location in their respective vehicles and drove to a pre-determined debriefing location. There, law enforcement officers searched UC-1, CS-1 and their vehicles for contraband, currency, and weapons, which, other than the firearms discussed above, yielded negative results. Law enforcement officers recovered the recording devices previously provided to UC-1 and CS-1 and processed them as evidence.

52. On July 11, 2025, CS-1 drove CS-1's Vehicle to a location in Long Island City, New York. While there, CS-1 gave THEUS the remaining $1,100 as payment for the Taurus.